# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| ALLIANT TECHSYSTEMS, INC., as Sponsor and Administrator of the Alliant Techsystems Inc. 401(k) Plan, | Civil No. 04-3539 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| TRACY C. MARKS and IRWIN BANK AND TRUST, as Guardian of the Estate of Rose A. Marier, | |
| Defendants. | |

Anthony R. Battles, **KELLY HANNAFORD & BATTLES PA**, 222 South Ninth Street, Suite 3900, Minneapolis, MN 55402, for plaintiff.

Denise Y. Tataryn, **MANSFIELD TANICK & COHEN, PA**, 220 South Sixth Street, Suite 1700, Minneapolis, MN 55402-4511, for defendant Tracy Marks.

Katherine L. MacKinnon, **MACKINNON LAW OFFICE**, 3744 Huntington Avenue, St. Louis Park, MN, 55416-4918, for defendant Irwin Bank and Trust.

Plaintiff Alliant Techsystems, Inc. ("ATK") filed an interpleader action in 2004 against defendants Tracy Marks ("Tracy") and Irwin Bank and Trust ("Irwin Bank") after defendants made competing claims to a 401(k) account administered by ATK. This Court granted Irwin Bank's motion for summary judgment, and Tracy appealed. The Court of Appeals for the Eighth Circuit reversed the Court's Order and remanded the case for further proceedings. This matter is now before the Court on defendants' cross-

motions for summary judgment.   For the reasons discussed below, the Court grants Tracy's motion and denies Irwin Bank's motion.

## BACKGROUND

Plaintiff ATK maintained a 401(k) retirement account on behalf of former ATK employee Lester James Marier, Jr. ("Jim").   Jim developed a close relationship with his stepdaughter, Tracy, during and after his marriage to Tracy's mother, Katie Marier. Tracy accompanied Jim to medical appointments when his health began to decline.[1]  Jim executed a power of attorney in favor of Tracy in 2001, and named Tracy as a personal representative of his will in 2002 and 2003.

Jim also maintained a close relationship with his widowed mother, Rose, who resides in Pittsburgh, Pennsylvania.[2]   Jim made periodic trips from his home in Minnesota to visit his mother, monitoring her finances and helping to ensure that her affairs were in good order.   Despite Jim's close relationship with his mother, however, Jim had apparently grown estranged from his siblings.

Jim's health began to decline in 2002.   Between March and October 2002, MRI reports showed substantial growth of Jim's cancerous tumor. Jim was hospitalized from August 30 until September 4, 2002, and underwent surgery to remove the tumor in October 2002.

---

[1] Jim was diagnosed with meningioma, a tumor of the protective lining of the brain and spinal cord, in the 1980s.

[2] Irwin Bank was appointed guardian of Rose's estate after Rose was adjudicated incapacitated.

On September 21, 2002, Jim submitted a revised beneficiary designation form for his 401(k) account, naming Tracy as the primary beneficiary under the account. Jim had initially designated Katie as the primary beneficiary of the 401(k) account, and Tracy as the secondary beneficiary, in 1996. Following Jim's divorce from Katie in 2000, Jim designated Rose as the primary beneficiary and Tracy as the secondary beneficiary. In both the 1996 and 2000 designations, Jim had specified Tracy's relationship to him as his "step-daughter" or "former stepdaughter." In the revised beneficiary designation form submitted in September 2002, however, Jim failed to complete the portion of the form describing Tracy's relationship to him. Instead, that portion of the form contained whiteout. In addition, the beneficiary designation form listed no secondary beneficiary.

On October 23, 2002, the 401(k) Plan service center, Fidelity Management Trust Company ("Fidelity"), returned the beneficiary designation form to Jim, instructing him that "white-out is not accepted to make corrections," and that he should complete the blank for Tracy's relationship and submit a new form. The form was marked "NIGO," or not in good order. Jim never submitted a revised beneficiary designation form.

Following Jim's brain surgery, he was hospitalized from October 16 until October 25, 2002. At this time, Tracy and Jim's sister, Susan, spoke by phone on numerous occasions. Susan, a trained nurse, offered to come to assist Jim. Tracy told Susan that that was not necessary because she was already acting as Jim's caretaker. Tracy also developed a code so that Jim would not have any unwanted visitors in the hospital. Tracy shared this code with Susan. Tracy was apparently concerned about a woman Jim had met on the Internet who was attempting to visit Jim in the hospital. Jim's

surgeon had initially told Tracy that Jim would never be able to live alone again, but Jim's health improved rapidly following the surgery, and he was discharged from a nursing home on November 4, 2002.

According to Tracy, in September 2002, prior to his brain surgery, Jim began acting very strangely.  Tracy called Susan and told her that Jim was having trouble thinking and communicating.  Jim's ex-wife, Katie, also made statements to a Fidelity employee on October 22, 2002, noting that Jim had been extremely confused and that his house was in disrepair.  On October 28, 2002, Katie again stated during a phone call to Fidelity that Jim had been very confused.  Susan also stated that Jim appeared disoriented around this time, noting that Jim seemed confused about where his mother lived.  Jim's sister Mary similarly reported that Jim was unable to carry out a coherent conversation on the telephone during this time.

Jim's attorney contacted Jim's doctor in November 2002 to seek a medical opinion regarding Jim's mental competence.  Specifically, the attorney inquired into Jim's competence on September 6, 2002, when Jim had made changes to his will.  The doctor delayed responding until he could conduct a physical examination on December 12, 2002.  Following the examination, the doctor responded that Jim was competent on December 12, 2002, but he did not provide an assessment of Jim's competence as of September 2002.  Upon receiving the response, Jim's attorney redrafted Jim's will, replacing Jim's September 2002 will with a new will dated January 2003.

On December 26, 2002, Jim called Fidelity to inquire who was listed as the current beneficiaries to his 401(k) account.  A Fidelity representative informed Jim that Tracy

was listed as the primary beneficiary.  Jim did not recall what percentage of the 401(k) account was to go to Tracy.  The Fidelity representative informed Jim that Tracy was the sole beneficiary and would get 100% of the proceeds.  The representative apparently failed to notice the NIGO notice on the screen, however, and did not mention to Jim that the form was not in good order.  Jim confirmed during the call that he wanted Tracy to be the sole beneficiary of the 401(k) account.

Jim died on September 25, 2003.  On October 1, 2003, Tracy and Katie called Fidelity in an attempt to determine the proper beneficiary of the 401(k).  The Fidelity representative stated that she was not permitted to discuss the 401(k) account with anyone but the beneficiary.  On November 4, 2003, Tracy again called Fidelity to discuss the account.  She was told that she was not the primary beneficiary.  Tracy responded, "I know I'm the primary beneficiary, I know I am.  We did all our estate planning for him, I mean with him."

Following Jim's death, Irwin Bank (for Rose) and Tracy made competing claims to the proceeds of Jim's 401(k) account.  ATK's Administrative Committee issued an "initial determination," finding that Tracy was the proper beneficiary under the 401(k) Plan.  Irwin Bank filed an administrative appeal of that decision.  Anticipating the likelihood of litigation, ATK filed this interpleader action.[3]  Tracy and Irwin Bank submitted cross-motions for summary judgment.  Irwin Bank argued that ATK's decision was improper because Jim's September 2002 change of beneficiary form did not comply

---

[3] The ATK Committee made no determination on the issues of undue influence or incompetence.

with the terms of the 401(k) Plan.  Alternatively, Irwin Bank argued that Jim's change of beneficiary in September 2002 was invalid because it was the product of mental incompetence and undue influence.

On August 25, 2005, this Court granted Irwin Bank's motion, applying a *de novo* standard of review to the ATK decision and finding that ATK's determination was not in compliance with the terms of the 401(k) Plan.  The Court therefore found that the September 2002 change of beneficiary was not valid, and directed that Rose was the proper beneficiary according to Jim's prior beneficiary designations of 2000.  The Court declined to reach Irwin Bank's alternative argument that the change of beneficiary was invalid because it was the product of incompetence and undue influence.

Tracy appealed, and the Eighth Circuit reversed.  *Alliant Techsystems, Inc. v. Marks*, 465 F.3d 864 (8th Cir. 2006).  Applying an abuse of discretion standard of review to the decision of the ATK Administrative Committee, the Eighth Circuit found that ATK's determination that Tracy was the proper beneficiary was not an abuse of discretion.  Accordingly, it remanded the case to this Court for a factual determination on the remaining issues of mental incompetence and undue influence, directing that the 401(k) account should be awarded to Tracy unless the Court finds that Jim's September 2002 change of beneficiary was the product of mental incompetence or undue influence.

## ANALYSIS

Both Irwin Bank and Tracy have filed cross-motions for summary judgment on the issues of incompetence and undue influence.  The parties have stipulated that the facts contained in the administrative record constitute all of the evidence in the case.  As such,

the Court looks to the administrative record to decide the disputed issues of incompetence and undue influence.  *See Radford Trust v. First Unum Life Ins. Co.*, 321 F. Supp. 2d 226, 239 (D. Mass. 2004), *rev'd on other grounds*, 491 F.3d 21 (1st Cir. 2007) (stating that ERISA cases "based solely or even primarily on the administrative record are thus uniquely fit for pre-trial resolution").  In such cases, summary judgment is "merely a mechanism for tendering the issues and no special inferences are to be drawn in favor of a plaintiff resisting in summary judgment."  *Id.*

## I.      BURDEN OF PROOF

Irwin Bank and Tracy dispute the relevant burden of proof that applies to Irwin Bank's claims of incompetence and undue influence.[4]  The 401(k) account at issue in this case is governed by the Employment Retirement Income Security Act ("ERISA").  29 U.S.C. §§ 1001 *et seq.*  ERISA contains a broad preemption clause, which provides that it shall "supersede any and all State laws insofar as they may now hereafter relate to any employee benefit plan."  29 U.S.C. § 1144(a).  Because ERISA is silent on the issues of incompetence and undue influence with respect to beneficiary designations, however, this Court must look to applicable federal common law standards.  *See Hill v. AT&T Corp.*, 125 F.3d 646, 648 (8th Cir. 1997).

Tracy first argues that federal common law requires Irwin Bank to show incompetence by clear and convincing evidence, citing to a decision of the Minnesota

---

[4] The parties do not dispute the substantive elements of incompetence and undue influence, however.

Supreme Court in *Jeruzal's Estate v. Jeruzal*, 130 N.W.2d 473, 482 (Minn. 1964) (stating that incompetence must be shown by clear and convincing evidence).  However, the Eighth Circuit has already determined that the appropriate burden of proof for claims of incompetence under the federal common law is by a preponderance of the evidence.  *See Taylor v. United States*, 113 F. Supp. 143, 148 (W.D. Ark. 1953), *aff'd sub nom. Taylor v. Taylor*, 211 F.2d 794 (8th Cir. 1954).  The decision in *Taylor* is binding upon this Court.  Accordingly, Irwin Bank must show by a preponderance of the evidence that Jim was incompetent at the time he designated Tracy as the primary beneficiary under his 401(k) account.

 With respect to undue influence, Tracy argues that this Court should look to Minnesota law in determining the federal common law standard for undue influence claims, which requires the contesting party to show undue influence by clear and convincing evidence.  *See In re Estate of Opsahl*, 448 N.W.2d 96, 100 (Minn. Ct. App. 1989).  Irwin Bank counters that only Minnesota applies a clear and convincing standard to undue influence claims, and that every other state in the Eighth Circuit applies a preponderance of the evidence standard.  *See, e.g.*, *Jackson v. Schrader*, 676 N.W.2d 599, 604 (Iowa 2003).  Irwin Bank argues that this Court should look to the majority approach in the Eighth Circuit to determine the appropriate burden of proof for undue influence claims.  *Cf. Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000) (looking to the law of the states comprising the Sixth Circuit to determine the federal common law of undue influence).

The Court agrees with Irwin Bank. One of the principal goals of ERISA is to "establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987). Uniformity is not possible if plans are subject to different obligations in different states. *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001). Tracy provides no caselaw support for her proposition that the district court must, in determining the appropriate federal common law standard, apply the law of the state in which it sits. Indeed, such an approach would be at odds with ERISA's goal of ensuring a uniform administrative scheme and avoiding a patchwork of conflicting state and federal laws. The Court finds that, in determining the applicable federal common law standard for undue influence, it is appropriate to consider the approaches of the various states in the Eighth Circuit, the majority which apply the preponderance of the evidence standard.[5] Based on this review, the Court concludes that Irwin Bank must show, by a preponderance of the evidence, that Jim's September 2002 change of beneficiary was the product of undue influence.

## II.     MENTAL INCOMPETENCE

The federal common law standard for mental incompetence requires that the donor know the nature of his property, the nature of his act, and the natural objects of his

---

[5] *See, e.g.*, *Jackson v. Schrader*, 676 N.W.2d 599, 604 (Iowa 2003); *Looney v. Estate of Wade*, 839 S.W.2d 531, 533 (Ark. 1992); *In re Estate of Price*, 388 N.W.2d 72, 76 (Neb. 1986); *In re Metz' Estate*, 100 N.W.2d 393, 394 (S.D. 1960); *In re Burris' Estate*, 72 N.W.2d 884, 889 (N.D. 1955).

bounty, including his relationship towards them and the consequences of his act, uninfluenced by any material delusions. *Taylor*, 113 F. Supp. at 148; *see also Met. Life Ins. Co. v. Hall*, 9 F. Supp. 2d 560, 564 (D. Md. 1998) (citing *Taylor* to derive appropriate federal common law standard for mental incompetence). As discussed above, the burden is on the party challenging the designation to prove mental incompetence by a preponderance of the evidence. *Taylor*, 113 F. Supp. at 148. Irwin Bank must show that Jim was incompetent at the time of the designation of the beneficiary on September 21, 2002. *Id.*

Irwin Bank argues that several key facts contained in the administrative record establish by a preponderance of the evidence that Jim was mentally incompetent on September 21, 2002. Irwin Bank notes that Jim's brain tumor grew substantially in the months leading up to his surgery in October 2002, and points to affidavit testimony by Jim's sisters stating that Jim sounded confused during telephone conversations in September and October 2002. The record also shows that Tracy told Susan during telephone conversations in September 2002 that Jim was having trouble thinking and communicating, including one episode in which Jim apparently perceived a city building to be a stalk of broccoli. Further, Irwin Bank argues that the fact that Jim's beneficiary form omitted Tracy's relationship, when he had twice included that information in prior beneficiary designation forms, suggests that Jim could not recall his relationship toward Tracy. Irwin Bank also points to Jim's phone call to Fidelity in December 2002, in which he inquired who was listed as the beneficiaries of his 401(k) account, arguing that this

demonstrates that Jim was incompetent at the time he designated Tracy as the primary beneficiary.

Based on a careful review of all the evidence contained in the administrative record, the Court is not persuaded that Irwin Bank has shown, by a preponderance of the evidence, that Jim was mentally incompetent when he made the change of beneficiary on September 21, 2002.  Although Jim's cancer grew substantially worse in the summer and fall of 2002, that evidence alone cannot establish Jim's mental incompetence, but must be considered along with other evidence of Jim's capacity and cognitive abilities when he designated Tracy as his primary beneficiary.  *Cf. Yochim v. Bd. of Trustees*, 435 N.E.2d 206, 209 (Ill. App. Ct. 1982).  Similarly, while Jim's failure to list his relationship with Tracy on the change of beneficiary form is puzzling, Irwin Bank cannot point to any direct evidence in the record that shows this failure was the result of mental incompetence, and there are equally plausible explanations for the omission.  For example, it is possible that Jim simply neglected to fill in the form after making a mistake in the initial entry, or that Jim thought Fidelity would be aware of the relationship, given that he had included Tracy as a beneficiary since 1996.

Further, the fact that Jim designated Tracy, and not Rose, as the primary beneficiary does not suggest to the Court an irrational or confused state of mind, but rather that Jim was aware of the objects of his bounty.  Jim had included Tracy as a beneficiary since 1996, and had grown close to Tracy during his fight with cancer, while the record shows that Rose had considerable wealth and had been gifting away a part of her estate to avoid tax consequences.  Nor do the statements of Jim's sisters and Tracy

regarding Jim's general confusion in October and September 2002 suffice to establish mental incompetency. *Cf. Matter of Estate of Rechtzigel*, 385 N.W.2d 827, 831-32 (Minn. Ct. App. 1986) (evidence that testator acted strangely and was confused and disoriented during the period in question did not suffice to establish mental incapacity at the time testator made change).  The Court further notes that the statements of Jim's sisters may be unreliable, given that the sisters were estranged from Jim, had seen him rarely, and based their observations on telephone conversations.

Finally, the fact that Jim called Fidelity in December 2002 to find out who was designated as the current beneficiaries to his 401(k) account does not establish mental incompetence on the date Jim changed his beneficiaries, September 21, 2002, particularly in light of the intervening brain surgery and lengthy recovery period in October and November 2002.  Indeed, during that call Jim informed a Fidelity representative that he wanted Tracy to be the sole beneficiary, suggesting that Jim understood the nature of his property, his donative act, and the natural objects of his bounty on September 21, 2002. It is plausible that Jim's telephone call to Fidelity was intended merely to ensure that Fidelity had in fact recorded his September 2002 designation of Tracy as the primary beneficiary.

In sum, the Court is not persuaded that the facts in the administrative record show that it is more likely than not that Jim was mentally incompetent when he made his change of beneficiary on September 21, 2002.  Based on a searching review of all the evidence in the case, the Court concludes that Irwin Bank has not shown Jim's mental incompetence by a preponderance of the evidence.  The Court therefore grants Tracy's

motion for summary judgment, and denies Irwin Bank's motion, on the issue of incompetence.

## III.    UNDUE INFLUENCE

Irwin Bank next argues that Jim's designation of Tracy as the primary beneficiary of his 401(k) account was the product of undue influence.  While Irwin Bank and Tracy again dispute the appropriate source of federal common law with respect to undue influence, the definition used by Minnesota courts is virtually identical with the definition used by other federal courts of appeals:  undue influence exists where the testator's will is substituted by the will of an influencing party.  *Compare In re Estate of Opsahl*, 448 N.W.2d 96, 101 (Minn. Ct. App. 1989) (finding undue influence where "the will of the person exercising [the influence] is substituted for the will of the testator whereby the resulting written testament expresses the intent and purpose of that person and not that of the testator"), *with Tinsley*, 227 F.3d at 704 (defining undue influence as "influence that is sufficient to overpower volition, destroy free agency, and impel the grantor to act against the grantor's inclination and free will") (internal citations omitted).  Courts look to a variety of non-exclusive factors in determining whether a benefactor's will was unduly influenced, including the physical and mental condition of the benefactor, whether the benefactor was given disinterested advice, the beneficiary's role in procuring the benefit, coercive or threatening acts by the beneficiary, the "unnaturalness" of the gift, and the nature and length of the relationship between the benefactor and beneficiary. *Tinsley*, 227 F.3d at 705; *see also In re Estate of Opsahl*, 448 N.W.2d at 101 (describing a similar list of non-exclusive factors to be considered).

Irwin Bank contends that facts in the administrative record show by a preponderance of the evidence that Jim's will was unduly influenced by Tracy. Irwin Bank points to Jim's physical and mental vulnerability in September 2002, including a memo by Jim dated November 5, 2002, in which Jim voiced concern over where he was going to live and who would look after his pets. Irwin Bank notes that Jim was highly dependent on Tracy for his personal and financial care, that he gave Tracy a power of attorney over his affairs, and that Tracy made efforts to prevent certain visitors from seeing Jim while he was in the hospital, establishing a code word so that only limited people could visit. The record also shows that Tracy and her mother, Katie, called Fidelity after Jim's death to inquire about the status of the 401(k) account beneficiaries, and that Tracy stated during one such conversation that "[w]e did all our estate planning for him, I mean with him." According to Irwin Bank, these facts show that Tracy had a significant role in securing her own status as the primary beneficiary, and that Tracy had little affection for Jim and was only interested in his money.

The Court has carefully considered all of the evidence in the record, and finds that Irwin Bank has not shown by a preponderance of the evidence that Tracy substituted her will for Jim's to effect the change of beneficiary. While Jim's weakened physical and mental condition in September 2002 may show there was an opportunity to assert undue influence, the indirect evidence of undue influence cited by Irwin Bank does not show that Tracy actually asserted undue influence on Jim. *See Norlander v. Cronk*, 221 N.W.2d 108, 112 (Minn. 1974) (stating that it is "not sufficient merely to show that the person benefited had an opportunity to exercise undue influence," but that there must be

"evidence that undue influence was in fact exerted").  As Tracy points out, Jim received disinterested estate planning advice in September 2002, and his decision to designate Tracy as the sole beneficiary of the 401(k) account appears consistent with that advice.

Nor does the Court find the designation of Tracy as the sole beneficiary to be "unnatural."  Tracy had been a named beneficiary since 1996, had provided for Jim during his fight with cancer, and had made the funeral arrangements after his death. Tracy's children called Jim "grand-pa," while Jim's relationship with his siblings was estranged.  Although Jim cared deeply for Rose, the Court finds that his decision to designate Tracy as his primary beneficiary is not so "unnatural" as to support an inference of undue influence.  Similarly, the telephone calls from Tracy and Katie to Fidelity do not necessarily show that Tracy had usurped Jim's will.  The calls were made several weeks after the change of beneficiary on September 21, 2002.  Jim had informed Tracy that she was to be the primary beneficiary, and Tracy naturally would have been distressed and confused when told by a Fidelity representative that she was not in fact a named beneficiary.

Finally, the evidence does not conclusively demonstrate that Tracy made efforts to isolate Jim from the rest of his family in September and October 2002.  Tracy informed Jim's sister that it was not necessary for her to care for Jim because she had dedicated herself as Jim's caretaker.  Tracy implemented a code to limit visitor access to Jim while he was hospitalized after discovering that Jim had developed a relationship with a stranger over the Internet.  Tracy shared the code with Jim's sister.  The evidence does

not suggest that Tracy took measures to prevent Jim's family from communicating with him or visiting him during this period.

In sum, the Court has closely reviewed the administrative record and finds that Irwin Bank has not shown by a preponderance of the evidence that Tracy substituted her will for Jim's in effecting the change of beneficiary.  The Court therefore grants Tracy's motion for summary judgment on the issue of undue influence, and denies Irwin Bank's motion.

## IV.    CONCLUSION

The Court concludes that Tracy Marks is the proper beneficiary of the ATK 401(k) account because Irwin Bank has not shown that Jim's change of beneficiary was the product of mental incompetence or undue influence.  Accordingly, the Court directs plaintiff ATK, as administrator of the 401(k) account, to transfer all ownership and control of Jim Marier's 401(k) account to Tracy Marks.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The judgment entered on August 26, 2005 [Docket No. 61] is **VACATED**.

2.      Defendant Tracy Marks's Motion for Summary Judgment [Docket No. 37] is **GRANTED**, as follows:

a.    Defendant Tracy C. Marks is the proper beneficiary of Jim Marier's benefits under the 401(k) Plan;

      b.    Plaintiff Alliant Techsystems, Inc., as administrator of the 401(k) plan, shall distribute the benefits under Jim Marier's 401(k) account to defendant Tracy C. Marks;

    3.    Defendant Irwin Bank's Motion for Summary Judgment [Docket No. 43][6] is **DENIED.**

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  March 31, 2008           _____ s/ John R. Tunheim_____
at Minneapolis, Minnesota.           JOHN R. TUNHEIM
                                 United States District Judge

---

[6] Docket Number 42 is also labeled a "Motion for Summary Judgment."  However, that document is a Notice of Hearing on the Summary Judgment Motion.